UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

FILED
NOV 15 2000


------------------------------------

JOAN-GANJE FISCHER,
LARRY FISCHER, and
MARSHALLS STARLITE,
INC.,

        Plaintiffs,

v.

CLAUDE KRAFT, and JOHN
AND JANE DOES 1-5,

        Defendants.

CIV. 00- 1027

**COMPLAINT**

**JURY TRIAL DEMANDED**

------------------------------------

    Plaintiffs Joan Ganje-Fischer, Larry Fischer, and Marshalls Starlite, Inc. (all of whom are sometimes hereinafter referred to collectively as the "Plaintiffs"), for their Complaint against defendant Claude Kraft and John and Jane Does 1-5, state and allege as follows:

**PARTIES**

    1.    Plaintiff Joan Ganje-Fischer is, and was at all times relevant to this action, a citizen and resident of the State of South Dakota. Ms. Ganje-Fischer is, and was at all times relevant to this action, a shareholder of Marshalls Starlite, Inc., as hereinafter described.

    2.    Plaintiff Larry Fischer is, and was at all times relevant to this action, a citizen and resident of the State of South Dakota. Mr. Fischer is, and was at all times relevant to this action, a shareholder of Marshalls Starlite, Inc.

(Mr. Fischer and Ms. Ganje-Fischer are husband and wife, and are sometimes hereinafter referred to collectively as the "Fischers.")

3.  Marshalls Starlite, Inc. (hereinafter referred to as the "Company") is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of South Dakota, with its principal place of business located in Aberdeen, South Dakota. The Company is, and was all times relevant to this action, engaged in the business of operating a truck stop and café known as the "Starlite Truck Stop & Family Restaurant."

4.  Defendant Claude Kraft (hereinafter referred to as the "Defendant") is, and was at all times relevant to this action, a citizen and resident of the State of South Dakota. The Defendant was at certain times relevant to this action, the President, a director and an employee of the Company.

5.  Defendants John and Jane Does 1-5 (hereinafter referred to collectively as "John and Jane Does"), are individuals, corporations, partnerships, associations, or other entities whose names and identities are presently unknown to the Plaintiffs, who acted in concert with and facilitated certain of the Defendant's wrongful and illegal activities.

## JURISDICTION AND VENUE

6.  This court has jurisdiction by reason of 28 U.S.C. § 1331 and 18 U.S.C. §§ 1964(a) and (c), as the action is founded upon and arises under, in part, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

7. This court has ancillary and pendent jurisdiction over all other claims.

8. Venue is founded upon one or more of the following:

(a) 28 U.S.C. §§ 1391 (b) and (c), because this is the judicial district in which the claims arose; and

(b) 18 U.S.C. § 1965 (a), because, at all times relevant hereto, the Defendant and the Company, resided, was found, had agents, or transacted its business in this judicial district.

9. The acts and transactions hereinafter alleged were effected by the use of, means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone calls, and interstate bank wire transfers.

10. In substantial part, the acts and transactions hereinafter alleged occurred within the State of South Dakota and within this judicial district.

11. At all times relevant hereto, the Defendant and the Company transacted business within this judicial district and division within the meaning of 18 U.S.C. § 1965(a).

**ALLEGATIONS COMMON TO ALL COUNTS**

12. In the summer of 1992, Ms. Ganje-Fischer became the principal shareholder of the Company by reason of the Company's redemption of the remaining shares held by Ms. Ganje-Fischer's sisters, Marilyn Marshall Maloney and Ann Aspelund. As part of the restructuring of the capital stock and management of the Company, in 1992 Ms. Ganje-Fischer was issued 333.34 of the Class A shares of the Company. In addition, Ms. Ganje-Fischer

and her husband, Larry Fischer, were issued, as joint tenants, 333.33 of the Class A shares of the Company.

13. As part of the management and ownership reorganization of the Company, the Defendant was offered the opportunity to become the manager of the Company and its various business operations, and was also issued 333.33 shares of the Class A stock of the Company, of which he retained 166.67 shares and his wife, Cindy Kraft, was provided 166.66 shares. Thus, the Defendant and his wife owned 33.33% of the issued and outstanding shares of the Company, and the Fischers owned 66.67% of the issued and outstanding shares of the Company. In addition, the Defendant was elected a director and President of the Company, which positions he retained until his resignation in early November 1999. Cindy Kraft was also elected Secretary of the Company.

14. Upon assuming these management responsibilities, the Defendant became familiar with the many business operations of the Company, which included the retail sale of a substantial volume of petroleum to truckers and automobile owners, the restaurant operations, together with the administration of petroleum "jobber" contracts under which millions of gallons of petroleum were sold, directly and indirectly. The Defendant also became familiar with the banking, credit card, and cash management aspects of the Company, including industry-specific aspects such as cash rebates from vendors. The more familiar the Defendant became with the Company's business, the more responsibility and managerial autonomy he was given by the Fischers. Not long after the Defendant became President, he had won the complete

confidence of the Fischers and was given wide latitude in conducting the day-to-day affairs of the Company.

15. Having assumed managerial control, the Defendant devised a plan, scheme and artifice by which he would embezzle cash, financial proceeds and other assets from the Company and would convert them to his own use. This plan, scheme and artifice was accomplished through forgery and/or the unauthorized endorsement of negotiable instruments. Upon information and belief, from time-to-time the Defendant utilized unauthorized bank accounts to hide and conceal the funds he had embezzled from the Company. The Defendant acted upon and used the Company through false, misleading and otherwise deceptive practices designed and intended to defraud the Company and the Fischers, all as hereinafter more particularly alleged.

16. The Defendant devised a plan, scheme and artifice under which he would embezzle and steal moneys and financial assets of the Company through forgery and deceit. Under this plan, when the Company received irregular revenues he would intercept checks remitted to the Company, endorse these negotiable instruments in an unauthorized, fraudulent and illegal manner, and then convert them to cash or other financial instruments. These unauthorized, fraudulent and illegal transactions include, but are not limited to, the following examples:

    (a)    The Company was indemnified by an insurer for property destroyed by a traffic mishap in the parking lot of the truck stop. The Company was issued an interstate check in the amount of $2,294.96. The Defendant stole the check, fraudulently endorsed it, negotiated the interstate check for cash which he then retained for his own personal uses.

    (b)    The Company was partially indemnified by the South Dakota Petroleum Release Fund for petroleum clean-up work undertaken by the Company at the truck stop. The Defendant intercepted a check issued by the South Dakota State Auditor in the amount of $49,738.77, endorsed and negotiated the check at a financial institution under false and fraudulent pretenses. The Defendant then deposited $29,738.77 in the Company bank account, and, through these deceitful and false pretenses, had one draft drawn in favor of himself and Cindy Kraft in the amount of $15,000, and another draft drawn in favor of New York Life Insurance Company, Annuity Division, in the amount of $5,000, which $5,000 check he then transmitted, through interstate mails, out of the state of South Dakota.

17.    As part of its retail operations, the Company receives rebates and commissions from vendors for the sale of such products as food products, soft drinks, tobacco products, etc. After a specified quantity of a respective product has been sold, the vendor sends the Company a check in the amount of the rebate earned by the Company. Realizing the value of these rebates, the Defendant devised an illegal plan, artifice and scheme, by which he would intercept these interstate checks and embezzle and otherwise convert them to his own personal use. Under the plan, the Defendant stole checks which include, but are not limited to, the following:

    (a)    In September 1996, a $400.23 US West rebate check;

    (b)    In December 1996, a $334.90 US West rebate check;

    (c)    In March 1997, a $381.56 US West rebate check;

    (d)    In June 1997, a $252.84 US West rebate check;

    (e)    In September 1997, a $279.16 US West rebate check;

    (f)    In December 1997, a $253.94 US West rebate check;

    (g)    In March 1998, a $163.15 US West rebate check;

    (h)    In June 1998, a $197.97 US West rebate check;

(i)   In September 1998, a $236.09 US West rebate check;

(j)   In December 1998, a $189.81 US West rebate check;

(k)   In March 1999, a $155.65 US West rebate check;

(l)   In June 1999, a $172.38 US West rebate check;

(m)   In December 1996, a $200.00 E.A. Sween rebate check;

(n)   In March 1997, a $300.00 US E.A. Sween rebate check;

(o)   In June 1997, a $300.00 E.A. Sween rebate check;

(p)   In September 1997, a $300.00 E.A. Sween rebate check;

(q)   In December 1997, a $300.00 E.A. Sween rebate check;

(r)   In March 1998, a $300.00 E.A. Sween rebate check;

(s)   In June 1998, a $300.00 E.A. Sween rebate check;

(t)   In September 1998, a $300.00 E.A. Sween rebate check;

(u)   In December 1998, a $300.00 E.A. Sween rebate check;

(v)   In March 1999, a $300.00 E.A. Sween rebate check;

(w)   In June 1999, a $300.00 E.A. Sween rebate check;

(x)   In June 1997, a $309.60 Coca Cola rebate check;

(y)   In September 1997, a $519.20 Coca Cola rebate check;

(z)   In December 1997, a $677.60 Coca Cola rebate check;

(aa)   In March 1998, a $151.00 Coca Cola rebate check;

(bb)   In June 1998, a $368.00 Coca Cola rebate check;

(cc)   In September 1998, a $594.00 Coca Cola rebate check;

(dd)   In December 1998, a $768.00 Coca Cola rebate check;

(ee)   In March 1999, a $302.60 Coca Cola rebate check;

(ff)   In June 1999, a $452.10 Coca Cola rebate check;

(gg) In September 1996, a $283.48 Hogg Restaurant Supply rebate check;

(hh) In December 1996, a $322.95 Hogg Restaurant Supply rebate check;

(ii) In March 1997, a $459.97 Hogg Restaurant Supply rebate check;

(jj) In June 1997, a $589.63 Hogg Restaurant Supply rebate check;

(kk) In September 1997, a $821.75 Hogg Restaurant Supply rebate check;

(ll) In December 1997, a $773.04 Hogg Restaurant Supply rebate check;

(mm) In March 1998, a $598.94 Hogg Restaurant Supply rebate check;

(nn) In June 1998, a $810.35 Hogg Restaurant Supply rebate check;

(oo) In September 1998, a $882.04 Hogg Restaurant Supply rebate check;

(pp) In December 1998, a $946.17 Hogg Restaurant Supply rebate check;

(qq) In March 1999, a $658.39 Hogg Restaurant Supply rebate check;

(rr) In June 1999, a $683.35 Hogg Restaurant Supply rebate check;

(ss) In December 1996, a $533.01 Telefon Calling Card rebate check;

(tt) In March 1997, a $847.57 Telefon Calling Card rebate check;

(uu) In June 1997, a $836.40 Telefon Calling Card rebate check;

(vv) In September 1997, a $1,286.89 Telefon Calling Card rebate check;

(ww) In December 1997, a $1,010.24 Telefon Calling Card rebate check;

(xx) In March 1998, a $961.65 Telefon Calling Card rebate check;

(yy) In June 1998, a $1,206.31 Telefon Calling Card rebate check;

(zz) In September 1998, a $1,247.08 Telefon Calling Card rebate check;

(aaa) In December 1998, a $1,080.58 Telefon Calling Card rebate check;

(bbb) In March 1999, a $1,484.95 Telefon Calling Card rebate check;

(ccc)   In June 1999, a $1,868.93 Telefon Calling Card rebate check;

(ddd)   In December 1996, a $365.25 ATM/ATMI rebate check;

(eee)   In March 1997, a $432.75 ATM/ATMI rebate check;

(fff)   In June 1997, a $580.50 ATM/ATMI rebate check;

(ggg)   In September 1997, a $758.25 ATM/ATMI rebate check;

(hhh)   In December 1997, a $657.75 ATM/ATMI rebate check;

(iii)   In March 1998, a $582.75 ATM/ATMI rebate check;

(jjj)   In June 1998, a $1,177.50 ATM/ATMI rebate check;

(kkk)   In September 1998, a $1,495.50 ATM/ATMI rebate check;

(lll)   In December 1998, a $1,314.00 ATM/ATMI rebate check;

(mmm)   In March 1999, a $723.00 ATM/ATMI rebate check; and

(nnn)   In June 1999, a $1,416.00 ATM/ATMI rebate check.

18.   Another scheme, artifice and device employed by the Defendant involves the misclassification of accounts relating to the personal expenses of the Defendant. The Defendant accounted for these expenses under repair and maintenance accounts, vehicle expense, officer travel and the like on the Company's general ledger. Through this artifice, the Defendant caused the Company to pay for personal expenses, without any prior authorization, which payments were hidden and concealed from accountants of the Company, the Board of Directors and the Fischers. These false and misleading accounting entries were made with the then present intent to hide and conceal the Defendant's fraudulent and illegal embezzlement and conversion of assets of the Company from the Board of Directors, the Fischers, and taxing authorities. These expenses included, but are not limited to, the following:

(a) The remodeling of the Defendant's basement, the cost of which exceeded $10,000, which was billed through a Company vendor;

(b) Electronics and stereo equipment for the Defendant's house and personal use;

(c) Liquor and food for entertaining the Defendant's personal friends; and

(d) A diamond ring, diamond earrings and diamond bracelets for the Defendant's girlfriend (which expenses were coded to "repair and maintenance" on the Company's general ledger).

19. The Defendant, together with co-conspirators John and Jane Does, engaged in yet another plan, scheme and artifice designed to defraud the Plaintiffs. This plan involved fraudulent and illegal kickbacks from the sale of petroleum and other retail goods sold through the Company's truck stop and fuel operations. Under this plan, John and Jane Does would artificially increase the price which the Company would purchase petroleum and the Defendant, knowing that the Company was paying more than it should have for the purchase of said fuel, would receive a kickback of a portion of the inflated margin. Upon information and belief, the Defendant also received kickbacks associated with the Company's purchase of other retail items sold through the truck stop operations. This kickback scheme was devised and carried out with the then present intent of the Defendant and John and Jane Does to defraud the Plaintiffs of moneys and property.

**CAUSES OF ACTION AGAINST THE DEFENDANT**

**COUNT ONE**

**CIVIL RICO: VIOLATION OF 18 U.S.C. § 1962(c)**

20. The Plaintiffs reallege each and every allegation contained in Paragraphs 1-19, inclusive.

21. The Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

22. John and Jane Does are "persons" within the meaning of 18 U.S.C. § 1961(3)

23. The Company, through its business operations, constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

24. The Defendant was associated with the Company during times relevant to this action, and as President and manager, directly and indirectly, conducted, directed and exercised control over the affairs of the Company.

25. John and Jane Does were associated with the Company during times relevant to this action, and through bribery and kickbacks to the Defendant exercised control over the affairs of the Company.

26. The Defendant devised a device, artifice, and scheme to defraud the Plaintiffs which utilized or caused to be utilized the U.S. Mails, interstate telephone wires, interstate bank wires, and other facilities of interstate commerce on at least 50 occasions, as hereinbefore alleged. Through said device, artifice, and scheme, the Defendant obtained from the Company and the Plaintiffs money and property in a manner prohibited by 18 U.S.C. §§ 1341 and 1343. The Defendant also transmitted and transferred, with fraudulent intent, stolen securities and moneys in interstate commerce with a value in excess of $5,000 or more in violation of 18 U.S.C. § 2314.

27. John and Jane Does devised a device, artifice, and scheme to defraud the Plaintiffs which utilized or caused to be utilized the U.S. Mails, interstate telephone wires, and interstate bank wires in a manner prohibited by 18 U.S.C. §§ 1341 and 1343.

28. The Defendant's and John and Jane Does' conduct and participation, directly and indirectly, in the affairs of the Company through the artifices of mail and wire fraud and the transportation of stolen securities, as set forth above, constitutes a pattern of racketeering activity in a manner prohibited by 18 U.S.C. § 1962(c).

29. The Plaintiffs have been injured in their business and property by reason of this violation of § 1962(c), in an amount which exceeds $75,000, the exact amount of which will be proven at trial.

**COUNT TWO**

**COMMON LAW FRAUD OF THE DEFENDANT**

30. The Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1- 29, inclusive.

31. The Defendant misrepresented the financial condition of the Company to the Fischers by concealing from them the fact that he had embezzled and otherwise converted financial and other assets of the Company to his own personal use.

32. The Defendant provided the Fischers with false and misleading financial statements and financial information with the then present intent

that the Fischers rely upon the information, and that they would be misled and defrauded by said false information.

33. The Fischers justifiably relied upon the false and misleading financial information provided to them by the Defendant.

34. The Fischers were misled and defrauded by the Defendant's distribution of knowingly and intentionally false and misleading information, and were damaged thereby. The damages the Fischers and the Company have incurred as the direct and proximate result of the Defendant's fraud and misrepresentations, exceeds $75,000, the exact amount of which shall be proven at trial.

## COUNT THREE

### CONVERSION/EMBEZZLEMENT OF COMPANY ASSETS BY THE DEFENDANT

35. The Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1- 35, inclusive.

36. At all times relevant to this cause of action, the Defendant had actual knowledge that the financial and other assets referred to above belonged to the Company, and that he had no right or interest in them other than indirectly as a shareholder of the Company.

37. The financial and other assets referred to above were the property of the Company, and the Defendant did not have any right or interest in them unless a distribution to the Defendant as a shareholder was authorized by the Board of Directors.

38. The Defendant knowingly and wrongfully caused said funds to be transferred to himself by negotiation of interstate checks through the use of the U.S. Mails, by interstate bank wires, and through other instrumentalities of interstate commerce, thereby depriving the Company of the use of said funds.

39. The Defendant wrongfully now exercises control and dominion over the funds, and refuses to relinquish said funds to the Company.

40. The Defendant's control and dominion over the funds, in violation of the Company's interest therein, constitutes conversion under the laws of the State of South Dakota, and the Defendant is liable for damages in excess of $75,000, the exact amount of which shall be proven at trial.

## COUNT FOUR

### BREACH OF FIDUCIARY DUTIES OF THE DEFENDANT

41. The Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1- 40, inclusive.

42. During times relevant to this cause of action, as hereinbefore alleged, the Defendant held the positions of manager, officer (President) and director of the Company, and was given a major role of trust and managerial responsibility in all of the Company's business affairs.

43. The Defendant sought and was given the highest level of confidence and responsibility by the Company, the Board of Directors and the Fischers, in exchange for his assurances that his performance of these responsibilities would be for the benefit of the Company and its shareholders.

44. The Company provided the Defendant with compensation in the form of shares of the Company which far exceeded that of someone with his level of experience in similar businesses.

45. In undertaking to perform the tasks as an employee, manager, officer, and director of the Company, the Defendant agreed to act in a fiduciary capacity and to exercise the highest degree of honesty, fidelity and loyalty toward the Company and its shareholders. This duty of fidelity and loyalty included the duty of the Defendant to desist from and protect against fraud, misrepresentation, embezzlement and conversion of Company assets. This fiduciary obligation arose under common law, under South Dakota corporate law, and under federal law.

46. The Defendant, through the acts and conduct hereinbefore alleged, breached his duty of fiduciary responsibility, all to the detriment of the Company and its shareholders.

47. As the direct and proximate result of this breach of fiduciary duty, the Company and the Fischers have been damaged in an amount in excess of $75,000, the exact amount of which shall be proven at trial.

**COUNT FIVE**

**THE DEFENDANT'S BREACH OF CONTRACT**

48. The Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1- 47, inclusive.

49. The Defendant's obligations as President and manager of the Company created a direct contractual obligation to the Company.

50. By reason of the facts hereinbefore alleged, the Defendant breached and failed to perform these contractual obligations to the Company.

51. The Defendant also breached his contractual duties to the Company by misrepresenting the financial benefits he was receiving from the Company.

52. The Defendant's breach of his contractual duties, by reason of the actions and conduct hereinbefore alleged, have caused damage to the Company in an amount which exceeds $75,000, the exact amount of which shall be proven at trial.

## COUNT SIX

### CONSTRUCTIVE TRUST IMPOSED UPON THE DEFENDANT

53. The Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1- 52, inclusive.

54. The Defendant obtained moneys, funds, assets and other benefits from the Company to which he was not entitled, as a result of the fraud, breaches of contract and other wrongful and illegal acts hereinbefore alleged. Those moneys, funds, assets and other benefits properly belong to and should have benefited the Company.

55. The imposition of a constructive trust is an equitable remedy needed to protect these moneys, funds, assets and other benefits wrongfully embezzled, converted and/or otherwise secreted from the Company. The Plaintiffs request that this Court impose such a constructive trust on all such funds to preserve the Company's prior and lawful right to such funds and

assets, and issue such other equitable and statutory relief as the Court deems appropriate, including an injunction prohibiting the transfer of such assets and/or the attachment and seizure of such property prior to judgment being entered herein.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs, and each of them, pray for a judgment on their Complaint and against defendants Claude Kraft and John and Jane Does 1-5, as follows:

1. Granting judgment against the Defendant and John and Jane Does 1-5, jointly and severally, pursuant to 18 U.S. C. 1962, et seq., in the amount of three times the compensatory damages awarded by the jury, which amount is in excess of $75,000, the exact amount of which shall be proven at trial.

2. Granting judgment against the Defendant for his common law fraud, which amount is in excess of $75,000, the exact amount of which shall be proven at trial.

3. Granting judgment against the Defendant for his conversion of assets of the Company, which amount is in excess of $75,000, the exact amount of which shall be proven at trial.

4. Granting judgment against the Defendant for his breach of his fiduciary duties, which amount is in excess of $75,000, the exact amount of which shall be proven at trial.

5. Granting judgment against the Defendant for his breach of contract, which amount is in excess of $75,000, the exact amount of which shall be proven at trial.

6. Imposing a constructive trust, injunction, restraining order, and/or writ of attachment upon the property wrongfully and illegally converted by the Defendant.

7. Granting the Plaintiffs their attorneys' fees and costs for bringing this action.

8. Granting the Plaintiffs interest upon all sums recovered herein.

9. Granting the Plaintiffs such other and further relief as this Court may deem just, equitable, and appropriate.

## JURY DEMAND

The Plaintiffs, and each of them, demand a jury trial of all issues set forth in this Complaint which are so triable.

Dated this 15th day of November, 2000.

SIEGEL, BARNETT & SCHUTZ, L.L.P.

_____
Ronald J. Hall
500 Capitol Building
PO Box 490
Aberdeen, SD 57402-0490
605-225-5420

Of Counsel:
Alan L. Kildow
LARKIN, HOFFMAN, DALY & LINDGREN, Ltd.
1500 Wells Fargo Plaza
7900 Xerxes Avenue South
Bloomington, Minnesota 55431-1194
(952) 835-3800

and

Linda A. Kildow
LINDA A. KILDOW & ASSOCIATES
1000 Lionsridge Loop
Vail, CO 81657
(970) 479-5583

Attorneys for Plaintiffs